# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOSEPH LAMONT JOHNSON,      )
                                       )

       Petitioner,          )
                                       )

v.                                )     NO. 3:14-cv-02305
                                       )     CHIEF JUDGE CRENSHAW

KEVIN GENOVESE, Warden,[1]    )
                                       )

       Respondent.       )

## MEMORANDUM OPINION

Petitioner Joseph Lamont Johnson was convicted by a jury of two counts of aggravated robbery, one count of aggravated assault, and one count of felony evading arrest and is now serving a fifty-four-year sentence imposed by the Davidson County Criminal Court on March 3, 2005. (Doc. No. 13-1, PageID# 131, 275–78.) Johnson filed this habeas corpus action under 28 U.S.C. § 2254 on November 26, 2014. (Doc. No. 1.) Respondent has answered Johnson's petition (Doc. No. 14) and filed the state court record (Doc. No. 13). After Johnson's counsel moved to withdraw (Doc. No. 17), this Court appointed the Office of the Federal Public Defender for the Middle District of Tennessee to represent Johnson (Doc. No. 23). On January 12, 2017, Johnson filed a reply to Respondent's answer to his petition. (Doc. No. 30.) Respondent does not dispute that

---

[1] When Johnson filed this petition, he was incarcerated at the Northeast Correctional Complex, where Gerald McAllister was Warden. (Doc. No. 1, PageID# 3.) Johnson is now incarcerated at the Turney Center Industrial Complex. (Doc. No. 8, PageID# 120 n.1.) "The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" Rumsfeld v. Padilla, 542 U.S. 426, 434 (2004) (quoting 28 U.S.C. § 2242). Accordingly, the Clerk of Court is **DIRECTED** to substitute Kevin Genovese, the warden of the Turney Center Industrial Complex, as the proper respondent in this proceeding. Fed. R. Civ. P. 25(d); Lane v. Butler, 133 F. Supp. 3d 888, 889 n.1 (E.D. Ky. 2015).

Johnson's petition is timely and that this is his first habeas petition related to this conviction. (Doc. No. 14, PageID# 1299.)

Johnson requests an evidentiary hearing on the issues raised in his petition. (Doc. No. 1, PageID# 13; Doc. No. 30, PageID# 1411.) This Court need not hold an evidentiary hearing where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007). The Court must consider Johnson's claims in light of the "deferential standards prescribed by [the Antiterrorism and Effective Death Penalty Act (AEDPA)]," under which a state court's factual findings are presumed correct subject to rebuttal by clear and convincing evidence. <u>Id.</u>; 28 U.S.C. § 2254(e)(1). Having reviewed Johnson's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. Johnson is not entitled to relief under AEDPA's standards. His petition will be denied and this case will be dismissed.

## I.     Procedural History

The state prosecution of Johnson emerged from the November 17, 2003 robbery of a Taco Bell on Brick Church Pike in Nashville. <u>State v. Johnson</u>, No. M2007-01644-CCA-R3-CD, 2009 WL 2567729, at *1 (Tenn. Crim. App. Aug. 18, 2009) ("<u>Johnson I</u>"); (Doc. No. 13-13). On February 6, 2004, Johnson was indicted by the Davidson County grand jury and charged with three counts of aggravated robbery, two counts of aggravated assault, one count of evading arrest, and one count of driving on a suspended license. (Doc. No. 13-1, PageID# 134, 139–40, 146–50.) After pre-trial developments that resulted in the dropping out of several charges (<u>see, e.g.</u>, <u>id.</u> at PageID# 163, Doc. No. 30 at PageID# 3 n. 4), Johnson went to trial before a jury on December 6, 2004, on two counts of aggravated robbery, one count of aggravated assault, and one count of evading arrest. (Doc. No. 13-1 at PageID# 165-66.) The jury found Johnson guilty as charged. (<u>Id.</u> at PageID#

166; Doc. No. 13-5, PageID# 611.) After reducing one of Johnson's aggravated robbery convictions to aggravated assault due to double jeopardy concerns (Doc. No. 13-15, PageID# 975), the Davidson County Criminal Court (hereinafter, the "trial court") sentenced Johnson to an aggregate term of fifty-four years. Johnson I, 2009 WL 2567729, at *1; (Doc. No. 13-1, PageID# 275–78). Johnson was represented at trial by attorney Paul Walwyn. (Doc. No. 1, PageID# 6.)

Represented by attorney David Wicker, Johnson appealed his conviction to the Tennessee Court of Criminal Appeal ("TCCA"). In his amended brief to that court, Johnson argued that the evidence at trial was insufficient to support his convictions, that the trial court erred in instructing the jury on the lesser included offenses of aggravated assault, and that the sentences imposed were excessive and should not have been made consecutive. (Doc. No. 13-11, PageID# 795–805.) On August 18, 2009, the TCCA held that the trial court had improperly instructed the jury that reckless endangerment was a lesser included offense of aggravated assault but that the error was harmless because Johnson was not found guilty of reckless endangerment. Johnson I, 2009 WL 2567729, at *1. The TCCA rejected Johnson's other arguments. Id. The Tennessee Supreme Court denied permission to appeal on February 22, 2010. (Doc. No. 13-15, PageID# 934.)

Johnson filed a pro se petition for post-conviction relief in the trial court on September 27, 2010. (Id. at PageID# 935.) On July 2, 2012, after being briefly represented by two other lawyers (id. at PageID# 951–54), Johnson filed an amended petition with the aid of attorney David Collins arguing that his trial counsel was constitutionally ineffective (id. at PageID# 955–69). The trial court held an evidentiary hearing on Johnson's ineffective assistance claims on August 10, 2012, and issued an order denying those claims on September 18, 2012. (Id. at PageID# 1062–70.)

Johnson appealed the trial court's denial of his petition for post-conviction relief, filing his appellate brief (again with counsel David Collins) on April 26, 2013. (Doc. No. 13-18.) On appeal,

Johnson argued five theories of ineffective assistance of trial counsel. (Id. at PageID# 1194.) In an opinion issued on February 27, 2014, the TCCA affirmed the trial court's decision. Johnson v. State, No. M2012-02310-CCA-R3-PC, 2014 WL 793636, at *1 (Tenn. Crim. App. Feb. 27, 2014) ("Johnson II"); (Doc. No. 13-22). On July 14, 2014, the Tennessee Supreme Court again denied permission to appeal. (Doc. No. 1-7.)

## II.    Statement of Facts

In considering Johnson's appeal of his conviction on direct review, the TCCA provided the following summary of the evidence presented at trial:

> At trial, Sadek "Sam" Alshinawa[2] testified that on November 17, 2003, he was the manager at a Taco Bell restaurant on Brick Church Pike in Nashville. Approximately ten minutes after the store opened at 10:00 that morning, Ebony Moore, who was working the register in the dining area, came into the office, where Alshinawa was working, and told him that "somebody is try[ing] to rob us." He and Moore then went to the dining area, where he saw a man, whom he identified as the defendant, jump onto the counter. Alshinawa said that the defendant wore a "dark maroon" jacket with a hood covering his head. Moore telephoned the police and Alshinawa pushed a button to activate a silent alarm.
>
> Alshinawa said that once the defendant got onto the counter, the defendant grabbed Moore's hair with his left hand while keeping his right hand in his pocket. Alshinawa testified that the defendant's right pocket appeared "heavy," as if a gun were in the pocket, and that the defendant did not remove his right hand from his pocket during the incident. Alshinawa said that during the incident he felt frightened and that Moore cried and told him, "Please help me." He said that at one point the defendant, who kept his hand inside the pocket with his index finger out and the thumb up, told him, "If you don't give me the money, I will hurt her." Alshinawa gave the defendant the money from the store safe, and Moore opened the cash register and gave him the money from the register. He said that the store usually kept around $600 on hand and that the defendant took approximately $200 to $300, some of which was in $5 and $1 bills. The defendant also demanded the store's surveillance videotape; Alshinawa said that the store did not have a working surveillance system but that he gave the defendant a training video.

---

[2]    Although both the post-conviction trial court and the TCCA spell Sadek's last name with an "A," records from Johnson's prosecution indicate that it is spelled "Ilshinawa." (Doc. No. 13-5, PageID# 525.) For the sake of consistency, the Court will follow the TCCA's spelling of his name.

After the manager gave the defendant the video, the defendant "grab[bed] [Moore by] her hair, again. He hit her in the wall. . . . I believe she hit . . . her head. . . . " After the defendant pushed Moore into the wall, he ran out the restaurant's front door. Alshinawa ran out the back door, carrying a metal object of some sort. He saw the defendant get into the driver's seat of a "goldish or silver" car in which another man wearing a brown jacket was seated in the front passenger seat. Alshinawa used the metal object to bust out three of the car's windows. The car sped off as the police arrived. Later that day, the police returned to the store with the defendant. Alshinawa told the police that he was sure that the defendant was the person who robbed the store; he testified that he and the defendant shoved each other at one point during the robbery and that he saw the defendant's face at that point. Alshinawa said that he was "100% certain" the man whom he saw in the car's passenger seat the day of the robbery was Willie Harris, the co-defendant at trial.

On cross-examination, Alshinawa said that the defendant kept his right hand in his pocket from the time he came into the store until the time he left. He said that he put the money inside the defendant's jacket pocket after being told to do so by the defendant. However, Alshinawa did not specify into which pocket he placed the money. He reiterated that the defendant's right jacket pocket looked like it contained "something heavy" and that there was "no way" the pocket could have been empty.

Several members of the Metropolitan Nashville Police Department testified regarding their involvement in this case. Officer Ben Ward, the first officer to testify, said that he arrived at the Taco Bell just as a silver Pontiac backed out of a parking space in the restaurant's parking lot. Officer Ward then saw Alshinawa leave the restaurant and bust out the car's windows before the car sped from the parking lot and drove onto Brick Church Pike. Officer Ward then chased the Pontiac in his police cruiser. The Pontiac led police through both business areas and residential neighborhoods; Officer Ward said that the defendant's car reached speeds of eighty miles per hour on straight stretches of highway in the business areas and sixty-five miles per hour in the residential areas. He said that during the chase, two separate police officers used their police cruisers to set up roadblocks at two different locations. Each time, the defendant narrowly missed hitting the police cruiser. Officer Ward also noted that the chase occurred during "the middle of the day and there [were] a lot of people out, people outside in the parking lot, [and there was a] lot of pedestrian traffic on the sidewalks as well."

Eventually, the car slid into a yard near the corner of McFerrin Avenue and Carter Street, in a residential area. The defendant and Harris left the car and ran in opposite directions. Officer Ward pursued and caught Harris while the other officers who had joined in the chase followed the defendant. Officer Ward said that Harris had "a little over two hundred dollars" in "[t]wenties, tens and fives" in his possession when arrested; Harris was not, however, carrying a gun when arrested.

Officer Byron Carter testified that he also arrived at the Taco Bell as the defendant's "silver vehicle" exited the parking lot. Officer Carter then joined the police chase of the defendant's car, with Officer Ward's cruiser being the first car behind the defendant and Officer Carter following Officer Ward. Like Officer Ward, Officer Carter also testified that the defendant's car far exceeded the speed limit during the chase; the officer said that his own car reached speeds of sixty-five miles per hour on the commercial roads and forty-five to fifty miles per hour on the residential streets. On cross-examination, Officer Carter said that when the defendant's car first left the Taco Bell there were no pedestrians near the restaurant and there was only "light" vehicle traffic.

Officer Michael Windsor testified that when he arrived in the vicinity of the Taco Bell, he saw the defendant's car exit the store's parking lot at a high rate of speed, with Officer Ward following him. Officer Windsor, who saw the defendant heading south on Brick Church Pike, pulled his police cruiser across the southbound lanes of Brick Church in an attempt to block the defendant's car. Officer Windsor, who did not get out of his car, saw the defendant's car approach his police car at a high rate of speed before it swerved onto the sidewalk, avoiding the police cruiser. He noted that the defendant's actions "put me in fear of my life and safety." Officer Windsor did not join the chase after the defendant passed him.

Officer Byron Agoston testified that he joined the chase of the defendant's car near the corner of Lischey Avenue and Cleveland Street. After a while, the defendant's car came to a stop in a house's yard and the car's driver (the defendant) and passenger fled in opposite directions. Officer Agoston followed the defendant, who initially ran down the sidewalk, in his police car; when the defendant ran "into a grassy area [and] down into a creek," the officer left his car and followed the defendant on foot. The officer followed the defendant through the creek for "[p]robably between fifty and seventy yards" before the defendant left the creek and fell onto the ground. Officer Agoston then arrested the defendant. The officer found forty-two dollars in cash in the defendant's pants pocket; he did not remember what the defendant was wearing at his arrest.

Officer Gary Clements testified that on the day of this incident he was near the intersection of McFerrin Avenue and Carter Street, where the chase ultimately ended, when he received a call about the police chase involving the defendant's car. He saw the defendant's car heading eastbound on Douglas Avenue, so he pulled his police car across Douglas in an attempt to block the defendant. The defendant's car approached the officer's car at a high rate of speed; Officer Clements thought that the defendant was going to hit him, but the defendant "dodged around to the rear of [the officer's] car and . . . went on by." After the defendant's car passed, Officer Clements pulled forward to let the pursuing police cars pass him before joining the chase himself. When the defendant's car came to a stop, Officer Clements followed Harris, the passenger. Officer Clements drove through a house's yard and pulled his car into an alley, trapping Harris, who was arrested by Officer Ward. Officer Clements later went into a creek near the arrest site and found money, a cellular

phone, and a driver's license and Social Security card belonging to defendant Johnson. Specifically, Officer Clements said that the officers recovered money in two separate "piles." He did not know how much money the officers recovered from the creek.

Detective Norris Tarkington testified that by the time he arrived at the house where the defendant's car stopped, the defendant and Harris had already been arrested. He said that the police found a Taco Bell videocassette, broken glass, some crumpled five dollar bills, and a blue hooded sweatshirt from the defendant's car. He said that when the defendant was caught, he was wearing a maroon hooded sweatshirt. Detective Tarkington brought the defendant and Harris back to the Taco Bell, and Alshinawa said that these two men were the ones whom he had encountered at the restaurant that morning.

The defendant testified that the morning of the incident, he and his fiancée drove to Vanderbilt University, where she was an instructor, in her Pontiac Grand Am. After the defendant dropped off his fiancée, he went to a house on Douglas Avenue to "shoot dice" and "get high." After staying at the house a while, he and Harris, who was also at the house, went to Taco Bell to get food. The defendant said that he was the only customer in the store at that point. He said that once he got inside the store, he noticed that nobody was working the front counter, so he "hollered 'hey'" "and waited there for five to ten minutes. He "kind of laid on the counter a little bit" because he was "under the influence;" after a while, Alshinawa "kind of shoved my head," which prompted the defendant to jump over the counter. The two men "started talking back and forth," which in turn escalated to "scuffling." According to the defendant, during the confrontation the defendant kept "seeing [Alshinawa] give [Moore] this eye contact as if to get something. . . ." After a while, the defendant left the store.

As the defendant headed toward his car, he heard police sirens and saw Alshinawa approach his car with a metal pipe in his hand. The defendant told Alshinawa not to swing the pipe at him, but Alshinawa knocked out the rear window and passenger-side windows with the pipe. The defendant claimed that Alshinawa then screamed, "Is this what you want?" and threw a videocassette into the car. The defendant said that he then "[took] off" when he saw the police, who began chasing his car. He said that another police car "kind of swerved" in front of him and he ran off the side of the road to avoid it. He said that he did not stop when the police chased him because he "was kind of panicked, scared . . . [and] high on drugs," and because he did not want to go to jail. The defendant said that after he was arrested, one of the officers took fifty-four dollars out of his (the defendant's) pocket and kept it. He said that Detective Tarkington took him back to the Taco Bell, where Alshinawa identified him. The defendant repeatedly told police that he did not rob anyone and did not have a weapon on him. He also claimed that one of the officers acknowledged to him that he never saw the defendant throw anything out of the car because "he was behind me the whole time."

The defendant said that he did not have a weapon with him and that Alshinawa did not place any money into his pocket during the incident. He said that during the incident he wore a two-piece nylon suit with brown dress shoes, and he also wore a burgundy jacket with a hood on it. He claimed that he did not wear the hood on his head when he went into the restaurant.

On cross-examination, the defendant acknowledged that he smoked marijuana and crack cocaine, used powder cocaine, and drank a twenty-two ounce can of beer at the Douglas Avenue house before going to the Taco Bell. He also denied keeping his hand in his pocket the entire time he was in the store. The defendant gave conflicting testimony regarding Officer Windsor's car; at one point, the defendant denied almost hitting him rather, instead saying that Officer Windsor "was already parked slanted . . . I just went around him." He said that Officer Windsor did not drive toward him and that the officer gave him sufficient room for him to drive around the police car without incident. He added, "I know better than to hit a police car." At another point, he said that he did not remember a police car setting a roadblock soon after leaving Taco Bell and that the only car that tried to block him was on Douglas Avenue. The defendant also denied throwing anything from his pockets. He said that his wallet and the money the police found in the creek could have fallen out of his pocket when he fell into the creek.

Johnson I, 2009 WL 2567729, at *1-5.

The trial court held an evidentiary hearing on Johnson's post-conviction ineffective assistance of counsel claims on August 10, 2012. (Doc. No. 13-15, PageID# 1062.) In considering Johnson's appeal of the trial court's denial of his post-conviction petition, the TCCA summarized that evidentiary hearing as follows:

The petitioner testified that trial counsel represented him for thirteen months, during which time, with the exception of trial counsel's hiring and of the trial, he never saw his attorney. The petitioner introduced a record of his jail visits which covered the duration of his pre-trial incarceration and in which trial counsel's name never appears. The petitioner testified he had eight or nine appearances in court prior to his trial date, but trial counsel never spoke to him about the case in the holding areas. Trial counsel did not provide him with discovery, as they had "no communication." Trial counsel also failed to provide him with street clothing for the jury trial. The petitioner testified that he was not aware that he would be on trial until the morning the trial began, that he did not have a chance to contact his family or get clothing for trial, and that a court officer was looking for clothing for him on the morning of trial. Counsel did not have an opening statement, did not have any prepared questions written down in anticipation of examining witnesses, and did not take petitioner's suggestions for questions to ask witnesses. The petitioner stated that his trial counsel did not investigate or interview any of the State's

witnesses. He testified that, had trial counsel interviewed Ms. Moore, she would have refuted Mr. Alshinawa's statements regarding the assault against her. According to the petitioner, neither the State nor his attorney subpoenaed her, and Ms. Moore was not even present in the Taco Bell.

The petitioner also asserted that trial counsel never conveyed the State's plea offer to plead guilty to the charges and be sentenced to twenty years as a Range II offender. Furthermore, trial counsel never informed him that he could be facing an aggregate sentence of over fifty years. The petitioner testified that, had he known about the potential punishment and the offer, he would have accepted the offer. On cross-examination, however, he maintained he had not committed any robbery, but when asked if he would have pled guilty to the crime, he answered, "It's possible, if I knew what I was facing going to trial. It's highly likely, yes, I would have accepted that 20[-]year deal." He elaborated that if he had known the range of sentencing he faced, he would have taken the twenty years. He also noted that he had pleaded guilty on other robbery charges because he was guilty. The petitioner testified, as further corroboration that trial counsel had not told him the range of punishment he faced, that trial counsel at the sentencing hearing told the trial court that he did not know how the petitioner's federal bank robbery conviction would be classified for the purposes of establishing range.

The petitioner also testified that he believed his counsel was deficient in not moving to have one of the aggravated robbery counts dismissed, because while the indictment alleged he had taken property from two separate people, the proof showed that he took money only from the business. The petitioner testified that he was ultimately sentenced for aggravated assault as a lesser-included offense of aggravated robbery.

The petitioner next alleged his counsel was deficient in failing to file a motion to suppress evidence of the show-up identification. Trial counsel did not advise him that if he testified, he would essentially be conceding issues of identification by putting himself at the scene of the crime.

The petitioner further alleged that his trial counsel erred in allowing the trial court to count his two prior state convictions for aggravated robbery separately, insisting that, as they were both committed on the same day, they should only count as one conviction for the purposes of establishing a sentencing range. The petitioner's appellate counsel refused to raise this as an issue on appeal.

Detective Norris Tarkington, who investigated the crime and was a witness at the petitioner's trial, testified that he did not recall trial counsel ever contacting him to discuss the facts of the case or the identification. Regarding the show-up identification, Detective Tarkington testified that the defendant was standing next to a police vehicle in handcuffs that were not readily visible and that he then brought the witnesses individually to make an identification. He testified that at the time, it was standard procedure to conduct a show-up if a suspect were apprehended within

two hours of a crime. He elaborated on cross-examination that the petitioner had been continuously in sight of police from the time he left the parking lot until the time he was apprehended. Detective Tarkington recalled that Ms. Moore told him that the petitioner had grabbed her by the hair and told her to open the cash register, then pulled her to the back. He did not recall Mr. Alshinawa saying that Ms. Moore was forced to lie on the floor or that she was not dragged but walked to the back of the store alone to tell him about the robbery. Mr. Alshinawa had also not told him that the petitioner slammed Ms. Moore's head into a steel door or that he and the petitioner had begun shoving each other. Detective Tarkington did not recall any prosecutor contacting him regarding finding Ms. Moore.

David Hopkins, who represented the co-defendant at trial, testified that he made a few attempts to contact the petitioner's attorney prior to trial to discuss trial strategy, but he was unsuccessful. Close to the time of trial, he was able to speak with petitioner's attorney and attempted to arrange a meeting, but they were unable to do so. Mr. Hopkins testified that on the day of trial, he had arrived early with clothing for his client, but trial counsel did not arrive on time, forcing the parties to wait for him. Trial counsel then asked to see Mr. Hopkins's copy of the discovery materials and started to review them. As he flipped through the discovery, he asked Mr. Hopkins a question similar to: "What's this case about?" Mr. Hopkins testified that he did not speak to trial counsel because the jury pool was already being brought into the courtroom, but trial counsel "seemed serious" in asking the question.

The petitioner's appellate counsel testified that he did not challenge the sentencing as a Range III offender because he believed the petitioner was sentenced within the correct range, having committed three prior Class B felonies and one Class C felony.

Trial counsel agreed that the petitioner had eight or nine court appearances and testified that they had "multiple discussions" during which the petitioner asserted that he had been at the Taco Bell, but the robbery was a misunderstanding and he had committed no crime. The petitioner had maintained his innocence and "he wasn't going to take any pleas." Trial counsel asserted that, while he did not give the petitioner the State's letter, he did convey the plea offer, and the petitioner rejected it. Trial counsel testified that, "basically they're wanting him to plead to a lot of time, and he said, well, I'm innocent, I didn't rob anybody, I didn't do it. He always said the same thing....But in any event, even prior to the trial, he basically said that I'm not taking a deal of any sort."

He acknowledged that he did not know at the time of the sentencing hearing how the petitioner's federal bank robbery conviction would be classified in Tennessee. He testified that he believed the classification was usually decided by the trial court, using analogous state crimes. He testified he did not look at the petitioner's prior convictions to determine if they were on the same day. Trial counsel testified that

he did not think the petitioner would get as lengthy a sentence as he did. Regarding discussions with the petitioner about sentencing, trial counsel testified as follows:

> Q. Okay. Did you ever have a discussion about the range of punishment he was facing?
>
> A. No, because I don't think we discussed what the total range was. I think we talked about what he could get for each individual offense, and mainly we were focused on the aggravated robbery portion, because I told him he could get eight to 30 on those cases. But we didn't talk about if the cases got split up and if they were consecutive and you know, everything could come down. We were mainly focused on the class B felonies.

Trial counsel testified that the defense theory of the case was that the petitioner lacked intent to rob the victims and that Mr. Alshinawa had been disrespectful to the petitioner, who was a customer, and the two became involved in a physical altercation. He testified that he did not move to dismiss the second count of aggravated robbery because he believed that the issue of a second robbery was a jury question. He testified that he didn't challenge the show-up both because the police had followed the petitioner from the actual scene of the crime and because the petitioner acknowledged being at the Taco Bell.

Trial counsel acknowledged not interviewing any of the State's witnesses, but stated he spoke with the police officers and detectives regarding the case. He stated that he did not give the petitioner a copy of the discovery because the petitioner was in jail, and he didn't want the documents available to other inmates. However, he asserted he did discuss the discovery with the petitioner. He acknowledged looking at Mr. Hopkins's discovery, but stated he did so because the photographs were of better quality than his copy. He testified that he did ask what the case was about but did so as a joke. He also testified that he had been in contact with the petitioner's family regarding bringing clothing, and that he was late because he was in the building trying to find clothing for the petitioner with the aid of the court officers.

Trial counsel admitted that he had received two public censures from the Board of Professional Responsibility in 2004 and 2006 for neglecting and failing to prepare a child support case and for filing a late notice of appeal and brief in another case. He testified that the petitioner had also filed a complaint against him but that the complaint had been found to be without merit.

Johnson II, 2014 WL 793636, at *2-5.

## III.    Issues Presented for Review

Johnson filed this petition on November 26, 2014 (Doc. No. 1), arguing that he "was denied the effective assistance of counsel at trial and sentencing in violation of the Sixth Amendment to

the United States Constitution as well as the right to the Due Process of Law[3] as guaranteed by the

Fifth and Fourteenth Amendments to the United States Constitution." (Id. at PageID# 7.) In his

petition, Johnson alleges that trial counsel[4] was ineffective in that he:

1) "failed to investigate the case at all or talk to a single witness" and thereby lost an opportunity to develop a defense (id. at PageID# 8);

2) "failed to communicate with Mr. Johnson at all prior to trial"—jail records indicate that trial counsel did not once visit Johnson (id.);

3) "failed to communicate and develop a strategy with Mr. Johnson at all prior to trial" which led to Johnson's conviction (id.);

4) "failed to advise Mr. Johnson at all regarding [his] decision to testify… and the consequences of that decision," which led to Johnson conceding the issue of identity (id. at PageID# 9);

5) "failed to communicate the State's plea offer," which Johnson states he would have taken had he received it (id.);

6) "failed to engage in any pretrial litigation whatsoever," filing no motions and making no challenges to the evidence presented (id. at PageID# 9–10);

7) "failed to move to suppress an illegal 'show up' identification conducted by the police," forfeiting a meritorious motion (id. at PageID# 10);

---

[3]     The Court does not construe Johnson's petition as raising a due process claim. Although Johnson states that the denial of the effective assistance of counsel violated the due process clause, the Supreme Court established in Strickland v. Washington that such a denial implicates only the Sixth Amendment. 466 U.S. 668, 684–85 (1984) (noting that "[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely though the several provisions of the Sixth Amendment, including the Counsel Clause"); Lafler v. Cooper, 566 U.S. 156, 176–77 (2012) (Scalia, dissenting) (observing that "[o]ur case law originally derived [the right to the effective assistance of counsel] from the Due Process Clause, and its guarantee of a fair trial … but the seminal case of Strickland v. Washington, located the right within the Sixth Amendment.") (internal citation omitted); United States v. Gonzalez-Lopez, 548 U.S. 140, 147 (2006).

[4]     Although Johnson's petition states that he "was denied the right to the effective assistance of counsel at trial, sentencing, and appeal" none of his specific claims of ineffective assistance concern the appellate proceedings in state court. (Doc. No. 1, PageID# 1, 7–12.)

8) "failed to object to a [m]ultiplicitous indictment" which resulted in "a sentence for a lesser-included offense" on one charge "rather than a dismissal" (id.);

9) "failed to object to hearsay presented at the trial" because he was unprepared (id. at PageID# 11);

10) "failed to confront witnesses with inconsistencies in their pretrial statements and their trial testimony" (id.);

11) "failed to prepare an opening statement for trial" (id. at PageID# 12); and

12) "failed to challenge the sentencing range proposed by the State" resulting in Johnson being "sentenced to an inappropriately high range." (Id.)

Johnson claims that the "cumulative effect" of these acts and omissions "amounted to the ineffective assistance of counsel to the degree that, absent the errors, there is a reasonable probability that the result of the trial would have been different." (Id.) Johnson also claims that trial counsel was so incompetent that he "was effectively denied counsel altogether." (Id.)

## IV.    Legal Standard

Johnson's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Bell v. Cone, 543 U.S. 447, 455 (2005) ("Bell II") (internal citations and quotations omitted); see also Hardy v. Cross, 565 U.S. 65, 66 (2011); Felkner v. Jackson, 562 U.S. 594, 597 (2011). AEDPA "requires heightened respect for state court factual and legal determinations." Lundgren v. Mitchell, 440 F.3d 754, 762 (6th Cir. 2006) (quoting Herbert v. Billy, 160 F.3d 1131, 1134 (6th Cir. 1998)). "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing' evidence." Davis v. Ayala, 135 S. Ct. 2187, 2199–2200 (2015) (quoting Rice v. Collins, 546 U.S. 333, 338–39 (2006)); 28 U.S.C. § 2254(e)(1).

The AEDPA standard is difficult to meet "because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011); see also Burt v. Titlow, 571 U.S. 12, 16 (2013); Metrish v. Lancaster, 569 U.S. 351, 357–58 (2013); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 563 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring); see also Woods v. Donald, 125 S. Ct. 1372, 1376 (2015). AEDPA prevents federal "retrials" of matters decided by the state court and "ensure[s] that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (Bell I). Under its provisions, petitioners may not "us[e] federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Parker v. Matthews, 567 U.S. 37, 38 (2012); see also White v. Wheeler, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court'") (quoting Burt, 571 U.S. at 16).

The statute provides for the review of state court decisions in § 2254(d), which states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court decisions or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. Bell I, 535 U.S. at 694 (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). In determining whether federal law is clearly established, this Court may not rely on the decisions of lower federal courts. Lopez v. Smith, 135 S. Ct. 1, 4 (2014); Harris v. Stovall, 212 F.3d 940, 943–44 (6th Cir. 2000). AEDPA limits the source of law applied in determining whether a state court decision is "contrary to" clearly established federal law to the holdings, not dicta, of cases decided by the United States Supreme Court. Williams, 529 U.S. at 412; Bailey v. Mitchell, 271 F.3d 652, 655 (6th Cir. 2001). Moreover, "clearly established Federal law" under AEDPA does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. Greene v. Fisher, 565 U.S. 34, 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state court's adjudication on the merits. Miller v. Stovall, 742 F.3d 642, 644–45 (6th Cir. 2014) (citing Green, 565 U.S. at 38).

The Court may grant relief under the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [United States Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407. A federal habeas court may not find a state court adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411; accord Bell I, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." Williams, 529 U.S. at 409. "[R]elief is available under §

2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 134 S. Ct. 1697, 1706–07 (2014) (quoting Harrington, 562 U.S. at 103).

AEDPA also imposes a total exhaustion requirement, contained in 28 U.S.C. § 2254(b) and (c), which directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or such remedies are no longer available. Rhines v. Weber, 544 U.S. 269, 274 (2005). With certain limited exceptions, to properly exhaust a claim under AEDPA, the petitioner must have raised the same claim on the same grounds before the state courts. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417) (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Lyons v. Stovall, 188 F.3d 327, 331 (6th Cir. 1999). In Tennessee courts, a petitioner has exhausted all available state remedies when the TCCA has denied a claim of error. Adams v. Holland, 330 F.3d 398, 401 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." Coleman v. Thomas, 501 U.S. 722, 732 (1991). If the claims can no longer

be considered by the state court because they are procedurally barred under state law, they are considered defaulted for purposes of federal review. A petitioner must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

## V.     Analysis

The Court begins its analysis by recognizing that the TCCA found trial counsel's performance deficient in advising Johnson as to what sentence he faced if convicted. Johnson II, 2014 WL 793636, at *8. Trial counsel "did not alert [Johnson] to his potential sentencing exposure if he proceeded to trial . . . [and] seemed to suggest that he had told [Johnson] he could get as little as eight years' imprisonment for the aggravated robbery charge" instead of the twenty-year minimum sentence Johnson in fact faced and received. Id. In addition to this finding, the state court record is replete with other apparently uncontested examples of counsel's lacking and questionable performance: jail records that show no attorney-client visits; failure to provide Johnson with discovery and counsel's apparent failure to obtain his own adequate copy of discovery; failure to provide Johnson with street clothes to wear at his trial; failure to inform Johnson of his trial date; showing up late on the day of trial; failure to interview State's witnesses; and failure to understand the factors that would lead to the calculation of Johnson's sentence. Id. at *2–3. The Court does not overlook or condone these shortcomings.

This Court does not evaluate those dispiriting facts anew. The current review is dictated by two deferential legal standards: Strickland v. Washington's high bar of proving objectively unreasonable representation and prejudice, 466 U.S. 668 (1984), and AEDPA's "doubly deferential" review of a state court's application of Strickland's rule. Leonard v. Warden, Ohio State Penitentiary, 846 F.3d 832, 848 (6th Cir. 2017). What this Court may consider is also defined

by what claims Johnson raised in the state courts and what of the arguments he now advances are limited by procedural default.

Strickland sets a two-part test to evaluate whether counsel has been constitutionally ineffective. A petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." Strickland, 466 U.S. at 688–89. The Strickland standard itself sets a high bar that is not easily surmounted by habeas petitioners. Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (alteration in original) (quoting Strickland, 466 U.S. at 690).

 "The Supreme Court has recently again underlined the difficulty of prevailing on a Strickland claim in the context of habeas and AEDPA; it requires the petitioner not only to demonstrate the merit of his underlying Strickland claim, but also to demonstrate that 'there is no possibility fairminded jurists could disagree that the state court's decision [rejecting the Strickland claim] conflicts with [Supreme Court] precedents." Jackson v. Houk, 687 F.3d 723, 740 (6th Cir. 2012) (citing Harrington, 562 U.S. at 102). Where a state court correctly identifies Strickland as the controlling precedent and applies it in evaluating a petitioner's claims, this Court applies a doubly deferential standard in its review. Leonard, 846 F.3d at 848. The Court must ask "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard" and, if so, deny relief. Id. (quoting Harrington, 562 U.S. at 89). "The pivotal question," therefore, is not whether this Court would find counsel's performance deficient, but "whether the state court's application of the *Strickland* standard was unreasonable." Harrington, 562 U.S. at 101 (emphasis added).

Even where, as here, counsel's performance is found constitutionally unreasonable, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. Strickland, 466 U.S. at 691. To establish the necessary prejudice, the petitioner must prove that, absent counsel's deficient performance, there is a "reasonable probability" that the result of the trial would have been different. Id. at 694. To prove prejudice in the context of plea negotiations, the petitioner "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler v. Cooper, 566 U.S. 156, 164 (2012). A court need not analyze both Strickland elements "if the defendant makes an insufficient showing on one"—"[i]n particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of one of the alleged deficiencies." Strickland, 466 U.S. at 697.

### A. Procedurally Defaulted Claims

Procedural default is a "threshold" issue "that a court generally considers before reviewing the applicable law and available remedies in a habeas petition." Lovins v. Parker, 712 F.3d 283, 294 (6th Cir. 2013) (citing Lambrix v. Singeltary, 520 U.S. 518, 524 (1997)). A claim may become procedurally defaulted in two ways. First, a claim is procedurally barred when it has been presented to the highest available state court and dismissed, not on the merits, but for failure to comply with a state procedural rule. Lovins, 712 F.3d at 295 (citing Williams v. Anderson, 460 F.3d 789, 806

(6th Cir. 2006)). Second, a claim is procedurally defaulted when it has never been presented to the state court and the chance to do so is now foreclosed by a state procedural rule. <u>Id.</u>

At issue here is the second type of procedural default—Respondent argues that Johnson's ineffective assistance claims based on trial counsel's failure to advise Johnson regarding the strategic consequences of choosing to testify, failure to engage in any pretrial litigation, failure to object to hearsay, and failure to challenge the sentencing range proposed by the State, were not "fully and fairly" presented to the highest available state court and further, that the opportunity to do so has passed due to Tennessee's statute of limitations and its "one petition" rule. Tenn. Code Ann. § 40-30-102(a), 40-30-102(c); (Doc. No. 14, PageID# 1298–99, 1319). Johnson concedes that his claims concerning trial counsel's failure to object to hearsay and failure to object to the sentencing range are procedurally defaulted.[5] (Doc. No. 30, PageID# 1384.) With respect to the remaining challenged claims, Johnson argues that, "having already set-forth the factual predicate [of those claims in his appellate brief], [he] (1) relied upon federal cases employing constitutional analysis in support of his broad ineffective assistance claim, and (2) the facts he alleged were well within the mainstream of constitutional law." (<u>Id.</u> at PageID# 1386.) Johnson argues that those claims are therefore not procedurally defaulted.

"To be eligible for habeas relief on any given claim, a state prisoner must fully and fairly present his claim, as a matter of federal law" to the highest available state court. <u>Stanford v. Parker</u>, 266 F.3d 442, 451 (6th Cir. 2001) (citing <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)). That means providing the relevant state court "with a 'fair opportunity' to apply controlling legal principles to

---

[5] Johnson asserts that the failure to object to hearsay claim might be considered as indirect evidence that trial counsel was completely unprepared for trial, which supports Johnson's claim that he was completely denied assistance of counsel. (Doc. No. 30, PageID# 1384 n.14.) That claim is rejected for reasons discussed herein.

the facts bearing upon [petitioner's] constitutional claim." Anderson v. Harless, 459 U.S. 4, 6

(1982) (quoting Picard, 404 U.S. at 276–77). "It is not enough that all the facts necessary to support

the federal claim were before the state courts, or that a somewhat similar state-law claim was

made." Landrum v. Mitchell, 625 F.3d 905, 918 (6th Cir. 2010) (quoting Anderson, 459 U.S. at

6). Instead, a claim presented in federal court must be brought "under the same theory" advanced

in state court. Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998) (rejecting petitioner's ineffective

assistance of counsel claim based on trial counsel's failure to pursue sufficient investigation on the

grounds that such a theory was not advanced when petitioner asserted ineffective assistance of

counsel before the state court).

In arguing that his claims are not procedurally defaulted, Johnson applies the following

legal standard:

> A petitioner can take four actions in his brief which are significant to the
> determination as to whether a claim has been fairly presented as a federal
> constitutional claim: "(1) reliance upon federal cases employing constitutional
> analysis; (2) reliance upon state cases employing federal constitutional analysis; (3)
> phrasing the claim in terms of constitutional law or in terms sufficiently particular
> to allege a denial of a specific constitutional right; or (4) alleging facts well within
> the mainstream of constitutional law."

(Doc. No. 30, PageID# 1385 (quoting Williams, 460 F.3d at 806).) But Williams v. Anderson and

the other cases Johnson cites are relevant when the question is whether, on direct appeal from

conviction, the petitioner fairly presented a claim as federal in nature or if, instead, the petitioner

asserted a claim based in state law. See Williams, 460 F.3d at 806; Newton v. Million, 349 F.3d

873, 877 (6th Cir. 2003); McMeans v. Brigano, 228 F.3d 674, 681–82 (6th Cir. 2000); (Doc. No.

30, PageID# 1384–85). There is no question here about whether Johnson, in his post-conviction

appeal, adequately identified the nature of his ineffective assistance of counsel claims. Instead, the

question is whether the TCCA received a fair opportunity to rule on the theories of ineffective assistance of counsel that Johnson now advances in federal court.

### 1. Failure to advise Johnson about whether to testify at trial

Respondent argues that Johnson never presented to the TCCA an ineffective assistance claim based on trial counsel's failure to advise him regarding his decision to testify and cites Johnson's appellate brief for support. (Doc. No. 14, PageID# 1320 (citing Doc. No. 13-18).) Johnson raised the following ineffective assistance of trial counsel claims in that brief:

(1) failure to communicate a twenty year plea offer;

(2) failure to prepare for trial and deficient representation during trial;

(3) failure to move pretrial to dismiss one of the counts of aggravated robbery;

(4) failure to move to suppress the show-up identification of Johnson; and

(5) failure to challenge Johnson's status as a Range III offender at the sentencing hearing.

(Doc. No. 13-18, PageID# 1194.) Johnson responds that the statement of facts in his appellate brief (inadvertently omitted from that brief originally but filed as a supplement) explicitly mentions trial counsel's failure to prepare Johnson to testify. (Doc. No. 30, PageID# 1385–86.) Further, Johnson points out that the argument section of his brief broke the failure to prepare for trial claim into several broad sub-claims—e.g., failure to communicate with the client and failure to interview witnesses—that were sufficient to encompass the claim that trial counsel failed to advise Johnson about whether to testify. (Id. at PageID# 1386.)

Johnson's puzzle-piece theory does not add up to demonstrating fair presentation. An examination of the appellate brief's statement of facts reveals that the reference to trial counsel's failure to advise Johnson regarding whether to testify comes in Johnson's summary of the post-

conviction hearing, which includes references to the claims that Johnson raised before the trial court:

> His next assignment was that trial counsel never told him that if he testified at trial, that he would be waiving any and all issues regarding identification. He stated he made the decision to testify because he didn't feel like trial counsel had his interest at heart. He stated trial counsel was telling him to testify in order to incriminate his codefendant.

(Doc. No. 13-20, PageID# 1248.) This lone reference to trial counsel's failure to advise Johnson about the decision to testify is not enough to constitute fair presentation of that claim, especially given that Johnson does not mention that failure anywhere else in the brief. (Doc. No. 13-18.) The claim is therefore procedurally defaulted. Tenn. Code Ann. § 40-30-102(c). As Johnson does not argue that there is cause for the default and resulting prejudice, this claim cannot be the basis of habeas relief. Gray v. Netherland, 518 U.S. 152, 162 (1996).

**2. Failure to engage in any pretrial litigation**

In Johnson's reply, he clarifies that the "factual predicate" of this claim is trial counsel's failure to file five specific motions: (1) a motion to dismiss one of the counts of aggravated robbery, (2) a motion to get a bill of particulars setting forth the conduct that each count of the indictment relied upon, (3) a motion challenging the identification on the day of the arrest, (4) a motion requesting that the court charge the long version of the identification instruction given in the pattern jury instructions, and (5) a motion for funding for an expert on the inaccuracies of eye-witness identification. (Doc. No. 30, PageID# 1385–86.) Johnson raised on appeal his claims that trial counsel failed to file a motion to dismiss one of the counts of aggravated robbery and failed to file a motion challenging the show-up identification on the day of the arrest. Johnson II, 2014 WL 793636, at *11; (Doc. No. 13-18, PageID# 1204–05). Those claims are therefore not procedurally defaulted.

With respect to trial counsel's failure to file the remaining motions, Johnson repeats his argument that reference to those motions in the statement of facts section of the brief constitutes fair presentation. (Doc. No. 30, PageID# 1385–86.) This argument is not compelling for the same reason discussed above. Trial counsel's failure to file the remaining motions is not referenced anywhere else in the brief. Johnson cannot now present his claim based on that failure to the TCCA and thus it is procedurally defaulted. As Johnson does not argue cause and prejudice to excuse the default, this claim cannot be the basis of habeas relief. <u>Gray</u>, 518 U.S. at 162.

### B. Ineffective Assistance of Counsel in Plea Negotiations

In his reply, Johnson attacks the TCCA's treatment of his ineffective assistance in plea negotiations claim on two separate bases. First, he argues that the TCCA issued a decision that was both contrary to and an unreasonable application of clearly established law by requiring Johnson to prove by clear and convincing evidence that he would have taken the plea offer had it been conveyed to him; Johnson was required only to demonstrate a reasonable probability that he would have taken the offer. (Doc. No. 30, PageID# 1404.) Second, Johnson argues that the TCCA's ruling was based on an unreasonable determination of the facts in light of the evidence presented, and specifically attacks the TCCA's findings that (1) trial counsel conveyed the plea offer to Johnson and (2) Johnson equivocated in response to questioning about whether he would have accepted the offer if it had been conveyed. (<u>Id.</u> at PageID# 1401–04.)

Respondent's arguments with respect to this claim precede Johnson's reply and therefore do not address Johnson's arguments directly. Respondent asserts only that there is not "clear and convincing evidence to overcome the presumption of correctness accorded" the TCCA's factual finding that trial counsel had conveyed to Johnson the plea offer, although Respondent also states in an argument heading that the TCCA's rejection of the ineffective assistance in plea negotiation

claim was "neither contrary to nor an unreasonable application of clearly established law." (Doc.

No. 14, PageID# 1314–15.)

In ruling on Johnson's ineffective assistance in plea negotiations claim, the TCCA provided

the following analysis:

> The *Strickland* standard for determining whether a petitioner received the ineffective assistance of counsel applies in plea negotiations as well as during trial. *Missouri v. Frye,* —— U.S. ——, ——, ——, 132 S.Ct. 1399, 1407, 1409, 182 L.Ed.2d 379 (2012); *see Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Accordingly, "counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye,* 132 S.Ct. at 1407. A fair trial does not correct deficient performance because of "the reality that criminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper,* —— U.S. ——, ——, 132 S.Ct. 1376, 1388, 182 L.Ed.2d 398 (2012). Accordingly, "it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process." *Frye,* 132 S.Ct. at 1407.
>
> In *Magana v. Hofbauer,* 263 F.3d 542, 549–50 (6th Cir. 2001), as in the petitioner's case, trial counsel testified that he had never told the accused that his sentences could be run consecutively. In *Magana,* trial counsel in fact had assured his client that the sentences would be concurrent and that the most he could be sentenced to after trial was ten years, which was equivalent to the State's plea offer. *Id.* The Sixth Circuit concluded that trial counsel's "gross misadvice to his client regarding the client's potential prison sentence, certainly fell below an objective standard of reasonableness under prevailing professional norms." *Id.* at 550; *see also Wooten v. Raney,* 112 Fed. App'x 492, 496 (6th Cir. 2004) (noting that "in some cases the failure to inform a defendant correctly of his sentencing exposure at trial may constitute ineffective assistance of counsel . . ." but rejecting the claim based on prejudice); *Grindstaff,* 297 S.W.3d at 221 (quoting *Moss v. United States,* 323 F.3d 445, 474 (6th Cir. 2003) for the proposition that "the failure of counsel to 'provide professional guidance . . . regarding . . . sentence exposure prior to a plea may constitute deficient assistance' "). "A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." *U.S. v. Wolfe,* No. 2:11–CR–33, 2012 WL 1957427, at \*10 (E.D. Tenn. May 31, 2012) (quoting *Smith v. United States,* 348 F.3d 545, 553 (6th Cir. 2003)). Based on the unconflicting testimony of the petitioner and trial counsel, trial counsel did not alert the petitioner to his potential sentencing exposure if he proceeded to trial. Furthermore, trial counsel's testimony seemed to suggest that he had told the petitioner he could get

as little as eight years' imprisonment for the aggravated robbery charge, which would be the minimum for a Range I offender. We conclude that trial counsel's performance was deficient.

The Supreme Court has recently addressed what a petitioner must prove to show prejudice when alleging that counsel's deficient performance resulted in the rejection of a more favorable plea offer:

> In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler,* 132 S.Ct. at 1385; *see also Magana,* 263 F.3d at 551–52 (predating *Lafler* and concluding that the petitioner established a reasonable probability that he would have accepted the plea based on his own testimony, on the large disparity between the ten-year offer and his forty-year exposure, and on trial counsel's testimony that the petitioner stated, after receiving the misadvice, that he would reject the offer "[u]nder those circumstances"). The Sixth Circuit does not require a defendant to support his own assertion that he would have accepted the offer with additional objective evidence. *Griffin v. U.S.,* 330 F.3d 733, 737 (6th Cir. 2003); *Smith,* 348 F.3d at 551.

In this case, the disparity between the offer, which was for twenty years' imprisonment, and the petitioner's exposure, which was fifty-eight years, is large. *See U.S. v. Morris,* 470 F.3d 596, 602 (6th Cir. 2006) ("This Court has given special weight to significant disparities between penalties offered in a plea and penalties of a potential sentence in determining whether a defendant suffered prejudice by not accepting a plea offer."). Furthermore, the State's case against the petitioner was particularly strong. Nevertheless, there is also evidence which suggests the petitioner would not have accepted any plea offer. First and most tellingly, the petitioner's own testimony on the issue was equivocal, as he testified at times that he would have taken the offer and at other times that it was "highly likely" or "possible" that he would have. Second, the petitioner maintained his innocence throughout the trial and post-conviction proceedings. The petitioner's testimony was that no robbery took place and that the store manager fabricated the robbery after an argument escalated into a physical confrontation. *But see Griffin,* 330 F.3d at 738 (noting that "declarations of innocence are therefore not dispositive on the question of whether [the petitioner] would have accepted the government's plea offer" and remanding for a hearing). Finally, petitioner's counsel testified that petitioner was adamantly opposed from the beginning to taking a plea offer, and he testified that the petitioner did not want to plead guilty because he steadfastly

maintained that he was innocent of the crime. The postconviction court "accredit[ed] the testimony of trial counsel that he did communicate the offer and that the petitioner was not interested in taking any plea." In light of the postconviction court's factual finding that the petitioner was "not interested in taking any plea" and other evidence suggesting that the petitioner was not interested in plea bargaining, we conclude that the petitioner has failed to establish by clear and convincing evidence that he would have taken the twenty-year plea offer. Accordingly, the petitioner has not shown a reasonable probability that, but for trial counsel's failure to alert him to his potential sentencing exposure, the plea offer would have been presented to and accepted by the sentencing court. *See Smith v. State,* No. E2003–00655–CCA–R3–PC, 2004 WL 73267, at *7 (Tenn. Crim. App. Jan. 9, 2004) (declining to find prejudice stemming from an allegation that counsel did not discuss consecutive sentencing because the petitioner's testimony showed "that he wanted to prove his innocence and that he believed that he had a chance to be acquitted on all the charges").

Johnson II, 2014 WL 793636, at *8-9.

At the outset of its analysis, the TCCA properly identified Strickland as the law governing ineffective assistance of counsel claims, holding that trial counsel's performance was deficient under the first prong. Id. at *8 (citing Magana v. Hofbauer, 263 F.3d 542, 550 (6th Cir. 2001)). It also properly identified Lafler as governing the prejudice analysis in the context of Johnson's ineffective assistance in plea negotiations claim. Id. at *9. However, the TCCA's analysis falters from that point.

In beginning its analysis, the TCCA correctly quotes Lafler's rule that, when alleging ineffective assistance of counsel in the context of plea negotiations, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." Id. (quoting Lafler, 132 S. Ct. at 1385). The TCCA then assessed the evidence presented in light of factors considered in Magana v. Hofbauer, 263 F.3d 542 (6th Cir. 2001), a case that predates Lafler but established a "reasonable probability"

standard in the Sixth Circuit for determining prejudice in the context of plea negotiations. In its conclusion, however, the TCCA contradicts itself. It finds, first, that Johnson "has failed to establish by clear and convincing evidence that he would have taken the twenty-year plea offer." Johnson II, 2014 WL 793636 at *9. In the next sentence, it concludes that Johnson "has not shown a reasonable probability that, but for counsel's failure to alert him to his potential sentencing exposure, the plea offer would have been presented to and accepted by the sentencing court." Id. The TCCA then cites Smith v. State, a case applying Tennessee Code Annotated § 40-30-110(f), which sets the standard under Tennessee law for proving facts in post-conviction proceedings. Tenn. Code Ann. § 40-30-110(f) ("The petitioner shall have the burden of proving the allegations of fact by clear and convincing evidence."); Johnson II, 2014 WL 793636, at *9 (citing Smith v. State, No. E2003-00655-CCA-R3-PC, 2004 WL 73267, at *7 (Tenn. Crim. App. Jan. 9, 2004)).

Johnson argues that the TCCA's apparent reliance on two contradicting standards resulted in a ruling that was "contrary to" clearly established law (Doc. No. 30, PageID# 1404, 1408) and cites Magana v. Hofbauer, to support his position. 263 F.3d at 550 (holding that the Michigan Court of Appeals, by requiring petitioner to demonstrate an "absolute certainty" that the outcome of the plea bargain would have been different, issued a decision that was "contrary to clearly established Supreme Court precedent"). But Magana was issued prior to the Supreme Court's decision in Holland v. Jackson, 542 U.S. 649 (2004), and the Court finds the latter case controlling here. In Holland, the Supreme Court reversed the Sixth Circuit's holding that the TCCA issued an opinion contrary to Strickland when it improperly analyzed prejudice under a preponderance of the evidence standard rather than that of a reasonable probability. Id. at 651–52. The Supreme Court emphasized that, as in this case, the TCCA began its analysis by reciting the correct standard from Strickland. Id. at 654. The Court construed the TCCA's reference to the preponderance

standard as "addressing the general burden of proof in postconviction proceedings with regard to factual contentions." Id. Although the Court found it "possible to read it as referring also to the question of whether the deficiency was prejudicial, thereby supplanting Strickland, such a reading would needlessly create internal inconsistency in the opinion." Id. Instead, the Court held that § 2254(d) "requires that 'state-court decisions be given the benefit of the doubt'" and that "'[r]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law.'" Id. at 655 (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

Following Visciotti's reiterated mandate, this Court must find the TCCA's conclusion not contrary to Strickland. The TCCA stated the proper standard governing the prejudice analysis three times in Johnson's case. First, in introducing Strickland; second, in introducing Lafler; and then again immediately after the reference to the Johnson's lack of "clear and convincing evidence," where the TCCA held that "[Johnson] [had] not shown a reasonable probability that, but for trial counsel's failure to alert him to his potential sentencing exposure, the plea offer would have been presented to and accepted by the sentencing court." Johnson II, 2014 WL 793636, at *6, 9. When the TCCA's use of the suspect statutory language is contextualized, it appears to be an aberration and not the rule applied.

Before stating that Johnson had failed to establish by "clear and convincing evidence" that he would have taken the plea offer, the TCCA made three purely factual determinations that influence (but do not determine) the analysis of whether there is a reasonable probability that Johnson would have taken the plea. First, the TCCA reiterated its finding that Johnson was equivocal in answering questions about whether he would have taken the plea. Id. at *9. Second, the TCCA emphasized that Johnson had maintained his innocence throughout the proceedings. Id. Third, the TCCA reiterated trial counsel's testimony that Johnson was "adamantly opposed from

the beginning" to taking a plea offer. Id. Given the TCCA's use of the proper standard elsewhere in the opinion (including in the sentence that follows its use of the suspect language), and Holland's reminder that state-court decisions must receive the benefit of the doubt, the TCCA may be understood to have found that Johnson failed to prove the contrary of the three aforementioned factual determinations by clear and convincing evidence, as it was his burden to do in the post-conviction proceeding. The TCCA's decision was therefore not "contrary to" clearly established law. See Daniel v. Curtin, 499 F. App'x 400, 411 n.5 (6th Cir. 2012) (holding that, despite imprecise language used in ruling on petitioner's claim of prejudice, the Michigan Court of Appeals was analyzing petitioner's Strickland claim "under the proper standard that it first articulated in its opinion); Urban v. Ohio Adult Parole Auth., 116 F. App'x 617, 627 (6th Cir. 2004) (crediting the Ohio Court of Appeals with applying the proper standard from Strickland despite failure to quote it and use of "slightly different terms"); Nichols v. Bell, 440 F. Supp. 2d 730, 775 (E.D. Tenn. 2006) (holding that TCCA's use of "no reasonable lawyer" language did not make its decision unreasonable where it had recited the complete Strickland standard elsewhere); but see Walker v. Hoffner, 534 F. App'x 406, 411–12 (6th Cir. 2013) (finding that the Michigan Court of Appeals had incorrectly stated the rule governing the analysis of prejudice under Strickland when it held that petitioner had not shown that failure to raise a particular defense "deprived [him] of a reasonably likely chance of acquittal") (internal citations omitted); Vasquez v. Bradshaw, 345 F. App'x 104, 112 (6th Cir. 2009) (holding that the Ohio Court of Appeals recitation of the proper standard once was not enough where it had applied an "incorrect burden of proof") (quoting West v. Bell, 550 F.3d 542, 552 (6th Cir. 2008)); Tinsley v. Million, 399 F.3d 796, 806–07 (finding that the Kentucky Court of Appeals had incorrectly stated the standard under

Strickland but that the error was "of no consequence" because petitioner had failed to establish prejudice).

Nor can the TCCA's rejection of Johnson's ineffective assistance in plea bargaining claim be labeled an unreasonable application of clearly established law. Even assuming Johnson established a reasonable probability that he would have accepted the plea offer, he did nothing to meet the additional burden Lafler imposes on defendants to demonstrate a reasonable probability that the prosecution would not have withdrawn the offer in light of intervening circumstances and that the court would have accepted its terms. Lafler, 566 U.S. at 164; see also Tallent v. United States, 567 F. App'x 343, 346–47 (6th Cir. 2014) (holding that, because petitioner pointed to nothing in the record to indicate "that he ever would have cooperated with the government," he could not show a reasonable probability that the terms of the original agreement would have been met and that the government "would not later rescind the offer"). The TCCA applies the Lafler rule in the final sentence of its analysis: "The petitioner has not shown a reasonable probability that, but for trial counsel's failure to alert him to his potential sentencing exposure, the plea offer would have been presented to and accepted by the sentencing court." Johnson II, 2014 WL 793636, at *9. The additional components of the rule are especially important when state law gives the prosecution and courts the discretion to reject a plea agreement, Missouri v. Frye, 566 U.S. 134, 147 (2012), which appears to be the case in Tennessee. See Parham v. State, 885 S.W.2d 375, 382 (Tenn. Crim. App. 1994) (stating that "the district attorney general may withdraw or revoke a plea bargain agreement "until accepted by the trial court" and "[a] plea bargain agreement is subject to

the trial court's approval").[6] The TCCA's conclusion that Johnson failed to establish prejudice under Lafler was not unreasonable.

Johnson also takes issue with the TCCA's deference to the post-conviction trial court's finding that trial counsel conveyed the State's plea offer to Johnson, who rejected it. (Doc. No. 30, PageID# 1401.) In reviewing the trial court's resolution of that factual question, the TCCA had to decide whether the evidence preponderated[7] against the trial court's finding. Johnson II, 2014 WL 793636, at *7. After engaging in the following analysis, the TCCA held that it did not:

> The petitioner's first claim is that trial counsel performed deficiently in failing to render effective assistance during plea bargaining. The petitioner testified that trial counsel never conveyed the State's offer to sentence him concurrently as a Range II offender to an effective twenty-year sentence. Although trial counsel acknowledged he did not give the State's offer letter to the petitioner, he testified that he "did relay the offer, as we had to, and he said he was not taking any time for this." In what became essentially a contest of credibility in which the petitioner asserted he did not know of the offer and trial counsel asserted he did, the trial court accredited the testimony of trial counsel and found that the offer was conveyed.

> The State's offer was made on December 2, 2004. The petitioner's trial began on December 6, 2004. In the intervening days, trial counsel's name continued to remain conspicuously absent from the roster of visitors whom the petitioner received in prison. Testimony at the hearing established that trial counsel was late to court on the day of trial, and the petitioner testified that his time before trial was taken up with the issue of finding adequate clothing and that the jury was in the box by time he was brought into the courtroom. The petitioner asks us to infer, from these facts, that the offer was not conveyed to him, and he asks us to conclude that the evidence

---

[6]    In Faison v. United States, the court held that where petitioner had shown that he would have accepted the plea offer, and there was no evidence suggesting that the court would have been unwilling to enter that offer, the petitioner had sufficiently established prejudice under Lafler. 650 F. App'x 881, 887 (6th Cir. 2016). This ruling seems to leave open the possibility that a petitioner can demonstrate a reasonable probability that the court would have entered the plea agreement without providing any affirmative evidence. However, the court that would have accepted the plea agreement in Faison was federal, eliminating Missouri's concerns about state rules that would prevent an accepted offer from being entered, and, further, the holding in Faison is not clearly established for purposes of AEDPA analysis. Id. at 882–84.

[7]    The TCCA will only overturn a lower court's factual determination if the evidence "preponderates otherwise." Johnson II, 2014 WL 793636, at *6 (quoting Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

preponderates against the trial court's finding that trial counsel conveyed the plea offer. However, we cannot say that the fact that trial counsel did not visit the prison precludes the possibility that he conveyed the offer in some other way. Neither post-conviction counsel nor the State inquired into the minutiae of the manner in which the offer was conveyed, and although the evidence suggests that trial counsel did not convey the offer in person, there is no evidence regarding the possibility that it was conveyed in some other manner; there is simply the testimony of counsel that he conveyed the offer and that of the petitioner that counsel did not do so. Ultimately, then, the question remains one of credibility. Questions concerning the credibility of the witnesses, the weight and value of evidence, and the factual issues raised by the evidence are resolved by the postconviction court. Honeycutt, 54 S.W.3d at 766–67. Furthermore, a post-conviction court's factual determinations are conclusive unless the evidence preponderates otherwise, Vaughn, 202 S.W.3d at 115. We conclude that the evidence does not preponderate against the postconviction court's determination that the offer was conveyed.

Id.

Johnson argues that the TCCA's ruling was based on an unreasonable determination of the facts: "the proof is diametrically opposed to the conclusion that trial counsel would have taken the time to try to convey the offer." (Doc. No. 30, PageID# 1402.) The offer was made on Thursday, December 2, 2004 and Johnson's trial began on the morning of Monday, December 6, 2004, leaving counsel little time to convey the offer. (Id. at PageID# 1401–02.) Further, a prison record established that trial counsel never visited Johnson while he was in prison, and counsel acknowledged that he was late to the court the morning of trial. (Id. at 1373, 1378, 1401.) The TCCA concluded that though trial counsel clearly did not convey the offer to Johnson in person, he might have done so in "some other way" and therefore the evidence did not preponderate against the trial court's decision to credit trial counsel's testimony that he had conveyed the offer. Johnson II, 2014 WL 793636, at *7. The TCCA's finding on this factual determination is entitled to a presumption of correctness under AEDPA and can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Although Johnson has provided reason to doubt the trial court's finding that the offer was conveyed, he has failed to meet that burden here.

Yet the Court need not decide whether Johnson has rebutted the TCCA's finding with clear and convincing evidence as that finding did not substantially affect[8] this particular claim of ineffective assistance. That is because the TCCA proceeded to conclude that the evidence before the trial court definitively established that trial counsel had failed to convey an essential aspect of the plea offer—"trial counsel never told the petitioner that, if he elected to reject the offer, his sentences could be run consecutively." Johnson II, 2014 WL 793636, at *7. Further, trial counsel "told [Johnson] he could get as little as eight years' imprisonment for the aggravated robbery charge, which would be the minimum for a Range I offender." Id. at *8. Having determined that trial counsel's failure to advise Johnson regarding his sentencing exposure amounted to deficient performance under Strickland, the TCCA proceeded to the same analysis that it would have undertaken had it found that the plea offer was never conveyed—namely, whether Johnson was prejudiced by counsel's failure to adequately convey the information contained in the plea offer. See id. at *8–9.

Johnson also objects to the TCCA's conclusion that he equivocated in his testimony at the post-conviction evidentiary hearing as to whether he would have accepted the State's plea offer had he been advised that he might face consecutive sentencing if convicted—a possibility that the written plea offer explicitly mentioned. (Doc. 13-15, PageID# 996; Doc. No. 30, PageID# 1403.) The TCCA points out that, when first asked if he would have taken the plea offer if he had known about it, Johnson responded with "[i]t's possible, if I knew what I was facing going to trial. It's

---

[8] The TCCA did reference the trial court's finding that the offer had been conveyed and that Johnson was not interested in taking it in concluding that he had failed to establish prejudice. However, that was only one of three factors the court considered in reaching its conclusion— "[f]irst and most tellingly, the petitioner's own testimony on the issue was equivocal . . . [and] [s]econd, the petitioner maintained his innocence throughout the trial and post-conviction proceedings." Johnson II, 2014 WL 793636, at *9.

highly likely, yes, I would have accepted that 20 year deal." Johnson II, 2014 WL 793636, at *3, 9; (Doc. No. 13-16, PageID# 1109:15–20). Johnson then stated, after the suggestion that Johnson's response might not be consistent with his continued proclamation of innocence, that "[t]he point is, if I'm facing 54 years and my attorney would have explained to me, under any circumstance, I would have taken 20 at 35 percent, if I was facing jay walking." (Doc. No. 13-16, PageID# 1109–10.) In finding Johnson's testimony to be equivocal, the TCCA was merely highlighting that his response shifted—from "possible" to "highly likely" to yes "under any circumstance." See Johnson II, 2014 WL 793636, at*9. Johnson points out that the shift in responses mirrored a shift in the questions presented, and argues that there is nothing equivocal about his final response. (Doc. No. 30, PageID# 1403.) Although Johnson's reading of the transcript is plausible, so too is that of the TCCA. Johnson has not met the high burden of upsetting the presumption of correctness accorded to the TCCA's finding of fact.

### C. Additional Ineffective Assistance Claims

Johnson challenges the TCCA's treatment of his remaining ineffective assistance claims on three bases. First, he argues that the TCCA's decision was either contrary to or an unreasonable application of clearly established law because it applied Strickland rather than United States v. Cronic, 466 U.S. 648 (1984), a case that allows courts to presume that a petitioner was prejudiced when petitioner was denied counsel at a critical stage. (Doc. No. 30, PageID# 1393.) Second, Johnson suggests[9] that even if Strickland governed his claims, the TCCA unreasonably applied it.

---

[9]     It is not clear from Johnson's reply whether he has challenged the TCCA's handling of his claims if in fact they are treated as claims under Strickland rather than Cronic. The Court construes his petition as doing so for three reasons: (1) in his petition, Johnson argues, in general terms, that the TCCA's "denial of relief involved rulings that were 'contrary to' or 'involved an unreasonable application of' clearly established federal law" (Doc. No. 1, PageID# 13); (2) Johnson argues that counsel's ineffective assistance resulted in prejudice (an argument that is unnecessary in the context of the presumed prejudice analysis of Cronic) (id. at PageID#12); and (3) Johnson

And finally, Johnson argues that the TCCA's ruling on his ineffective assistance claim based on trial counsel's failure to communicate was based on an unreasonable determination of the facts. (Id. at PageID# 1391–93.)

### 1. Failure to Apply <u>United States v. Cronic</u>

<u>Strickland</u> and <u>Cronic</u> address different aspects of the Sixth Amendment's guarantee of counsel in criminal proceedings. <u>Strickland</u> provides relief when counsel's performance falls below an objective standard of reasonableness and the defendant can show a reasonable probability that counsel's performance impacted the outcome of the trial. <u>Strickland</u>, 466 U.S. at 687–88, 694. <u>Cronic</u> addresses cases in which the Sixth Amendment is violated, not because of counsel's deficient performance, but by circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." <u>Cronic</u>, 466 U.S. at 649, 658, 665 (finding no Sixth Amendment violation where trial court allowed counsel only 25 days to prepare for trial, despite his inexperience and the length and complexity of the government investigation underlying the prosecution). The Court provided three examples of such circumstances: (1) the complete denial of counsel at a critical stage of the trial; (2) counsel's absolute failure to "subject the prosecution's case to meaningful adversarial testing;" and (3) the existence of constraints making it unlikely that even competent counsel could provide adequate assistance. Id. at 659–60.

In his reply to Respondent's answer, Johnson argues that the facts he alleged in his post-conviction proceedings "rose to the level of a complete denial of counsel, which must be analyzed under the constructive denial of counsel at a critical stage analysis set-forth [sic] in [<u>Cronic</u>]." (Doc. No. 30, PageID# 1393.) Therefore, Johnson argues, the TCCA's decision rejecting his Sixth

---

continues to argue prejudice in his reply brief, suggesting that, in measuring it, the Court may aggregate the harm caused by counsel's errors. (Doc. No. 30, PageID# 1387).

Amendment claims by applying <u>Strickland</u> was "contrary to" or involved an "unreasonable application" of clearly established law. (<u>Id.</u>)

First, the Court must consider whether this claim is properly considered as part of Johnson's habeas petition because it is raised for the first time in Johnson's reply to Respondent's answer. (Doc. No. 30, PageID# 1393.) Although his original petition (Doc. No. 1, PageID# 12) does state that the effect of his counsel's deficient performance is that he was "effectively denied counsel altogether," it appears that this assertion was intended more as rhetorical flourish than a <u>Cronic</u> claim. The petition does not mention <u>Cronic</u> or reference a "critical stage" of the trial and instead argues that Johnson suffered prejudice from each instance of alleged ineffective assistance, an argument that is only required under <u>Strickland</u>. <u>See</u> <u>Cronic</u>, 466 U.S. at 659 n.26; (Doc. No. 1).

The Sixth Circuit holds that, in the habeas context, a claim that is raised for the first time in a petitioner's reply (or traverse) "is not properly before the district court." <u>Tyler v. Mitchell</u>, 416 F.3d 500, 504 (6th Cir. 2005); <u>see also</u> <u>Thompkins v. McKune</u>, 433 F. App'x 652, 659 (10th Cir. 2011) (stating that "raising an issue for the first time in a reply brief or traverse is insufficient to preserve it"); <u>United States v. Barrett</u>, 178 F.3d 34, 46 (1st Cir. 1999) ("This court has already rejected Barrett's argument that he properly presented the Jencks Act claim by traverse and has held that the district court did not err in failing to rule on the claim."); <u>Jackson v. Duckworth</u>, 112 F.3d 878, 880 (7th Cir. 1997) (noting that a "[t]raverse is not the proper pleading to raise additional grounds for relief") (quoting <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994)). Because Johnson makes this argument for the first time in his reply, the Court need not consider it. However, even if the Court were to find this claim properly raised, it does not support habeas relief for Johnson.

The TCCA did not err in considering Johnson's claims under <u>Strickland</u>. In neither his briefing before the trial court (Doc. No. 13-15, PageID# 955–69) nor in the TCCA (Doc. No. 13-18, PageID# 1189–1211) does Johnson mention <u>Cronic</u> or allege the denial of counsel at a critical stage; instead, as in his petition in this court (Doc. No. 1), Johnson identifies specific instances of ineffective assistance and argues prejudice under <u>Strickland</u>.[10] In his reply brief in this Court, Johnson argues that the TCCA committed the same error that the Sixth Circuit attributed to the Michigan Supreme Court in <u>Mitchell v. Mason</u>, 325 F.3d 732 (2003). (Doc. No. 30, PageID# 1397.) In <u>Mitchell</u>, the Sixth Circuit held that the Michigan Supreme Court unreasonably applied <u>Cronic</u> in concluding that it did not govern the petitioner's claim, where the petitioner had been constructively denied counsel at the critical pretrial stage. <u>Mitchell</u>, 325 F.3d at 741. Importantly, unlike Johnson, the petitioner in <u>Mitchell</u> raised a <u>Cronic</u> claim in state court, which the Michigan Supreme Court rejected. <u>Id.</u> To conclude, as Johnson urges, that the TCCA made the same mistake here would be to overlook that distinction and fault the TCCA for not considering a <u>Cronic</u> claim that Johnson never raised.

Finally, even if Johnson were found to have adequately raised a <u>Cronic</u> claim in state court, the Court would not find that the TCCA's application of <u>Strickland</u> was contrary to clearly established law. Johnson claims that his allegations fall within the first <u>Cronic</u> scenario—the complete or constructive denial of counsel at a critical stage. (Doc. No. 30, PageID# 1393.) His argument is rooted in ten specific factual allegations of ineffective assistance: "(a) failure to investigate, (b) failure to communicate, (c) failure to develop a defense, (d) failure to advise (pre-trial) of consequences of testifying, (e) failure to communicate plea, (f) failure to engage in any

---

[10]     Respondent does not argue that Johnson's <u>Cronic</u> claim is procedurally defaulted, and the Court declines to consider that affirmative defense *sua sponte*. <u>Stojetz v. Ishee</u>, 389 F. Supp. 2d 858, 910 (S.D. Ohio 2005).

pre-trial litigation, (g) failure to seek suppression of show-up identification, (h) failure to object to multiplicitous indictment, (j) failure to cross-examine witnesses with prior inconsistent statements, and (k) failure to prepare an opening statement." (Id. at PageID# 1388.) The Supreme Court has characterized Cronic as creating only a "narrow exception" to the general rule in Strickland that "a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense," Florida v. Nixon, 543 U.S. 175, 190 (2004), and warned that federal courts should hesitate before concluding that a state court's failure to apply Cronic was contrary to clearly established law. See Woods v. Donald, 135 S. Ct. 1372, 1377 (2015) (holding that none of the cases cited in Cronic as examples of a complete or constructive denial of counsel "dealt with circumstances like those present here"—namely, counsel's ten-minute absence during testimony that he had indicated to the court was irrelevant to his client—and therefore the Sixth Circuit erred in affirming Cronic-based habeas relief); Wright v. Van Patten, 522 U.S. 120, 125 (2008) (holding that no Supreme Court precedent "clearly establishes that Cronic should replace Strickland in this novel factual context"—counsel's participation in a plea hearing via speaker phone). It is not clearly established that Cronic applies to a fact pattern like Johnson's;[11] therefore, to the extent Johnson could be

---

[11]    As mentioned above, Johnson analogizes his case to that of the petitioner in Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003). (Doc. No. 30, PageID# 1395.) As Sixth Circuit precedent, the holding of that case is not clearly established for the purpose of analyzing whether the TCCA's decision was contrary to clearly established law. See Williams, 529 U.S. at 412. But even if that were not the case, the facts of Mitchell are significantly different from Johnson's case. As the Sixth Circuit emphasized in holding that the Michigan Supreme Court should have applied Cronic rather than Strickland, petitioner's lawyer had not only never consulted with his client during the pretrial stage, he has also been "suspended from practicing law for the month preceding trial" and "the court [had] acquiesce[d] in [the] constructive denial of counsel by ignoring the defendant's repeated requests for assistance." Id. at 744.

found to have raised a constructive denial of counsel claim under Cronic before the TCCA, that court did not err in applying Strickland.

Johnson also appears to argue that the third Cronic scenario is relevant to his claims—he analogizes the situation created by his trial counsel to the facts of Powell v. Alabama, 287 U.S. 45 (1932), a case that the Court in Cronic cited as illustrative of a circumstance in which "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Cronic, 466 U.S. at 659–60; (Doc. No. 30, PageID# 1394–95). Yet Johnson's trial counsel, unlike the lawyer in Powell, was not charged by the court with the task of representing a criminal defendant the day that the trial began with "whatever aid the local bar could provide." See Cronic, 466 U.S. at 660 (citing Powell, 287 U.S. at 53). The alleged inadequacy of counsel's representation of Johnson stems entirely from choices that counsel made, and not from an external constraint that would prevent even an excellent lawyer from performing at a constitutionally sufficient level. The TCCA did not err in failing to identify Cronic as controlling Johnson's claims.

**2. Analysis of Ineffective Assistance Claims under Strickland**

The TCCA properly recited the standard from Strickland before proceeding to analyze Johnson's ineffective assistance claims. See Johnson II, 2014 WL 793636, at *6; (Doc. No. 13-15, PageID# 1064). Relief is therefore only available under AEDPA if the TCCA's rulings on those claims were based on an application of the Strickland standard that was "objectively unreasonable" or if they were based on an unreasonable determination of the facts. Williams, 529 U.S. at 409; 28 U.S.C. § 2254(d)(1)–(2).

### a. Failure to investigate, interview witnesses, and communicate with Johnson

The TCCA dismissed these claims by concluding that Johnson had failed to make any showing of prejudice. With respect to trial counsel's alleged failure to investigate or interview witnesses, the TCCA stated:

> When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State,* 794 S.W.2d 752, 757 (Tenn.Crim.App.1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Pylant,* 263 S.W.3d at 869 (quoting *Black,* 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black,* 794 S.W.2d at 757. Presenting the witness allows the post-conviction court to determine whether that witness's testimony would have been credible, material, and admissible. *Pylant,* 263 S.W.3d at 869–70. Without the post-conviction testimony of Mr. Alshinawa and Ms. Moore, the claim is purely speculative and the petitioner cannot show prejudice.

Johnson II, 2014 WL 793636, at *10.

Because Johnson did not call Alshinawa or Moore at the post-conviction hearing, the TCCA concluded that Johnson's suggestion that an interview of Alshinawa or Moore "[might] have" revealed additional discrepancies between Alshinawa's testimony and his initial statement to the police was not enough alone to establish prejudice. Id. This was not an objectively unreasonable application of Strickland. See Stewart v. Wolfenbarger, 468 F.3d 338, 353 (6th Cir. 2006) (upholding the TCCA's conclusion that petitioner had not adequately shown that the failure to call a particular witness deprived petitioner of exculpatory testimony where the witness did not testify at the post-conviction hearing). The fact that Detective Tarkington testified at the hearing about inconsistencies between Alshinawa's testimony at trial and his initial statement to the police did not change that because "the fundamentals of [Alshinawa's] testimony—that the defendant entered the store, threatened Mr. Alshinawa and Ms. Moore with what appeared to be a gun in his

pocket, and took money from the cash register—remained unchanged." Johnson II, 2014 WL 793636, at *10. That too was a reasonable application of Strickland. See Poindexter v. Mitchell, 454 F.3d 564, 572–73 (6th Cir. 2006) (finding that challenged testimony established, despite inconsistencies, that petitioner had fired two shots at witness's head, and therefore Ohio Court of Appeals' "ruling that the inconsistent statements were immaterial to the result [was] entitled to deference").

The TCCA dismissed Johnson's claim that counsel entirely failed to communicate with him prior to trial by pointing out that Johnson had provided no "explanation of how the trial would have been different if trial counsel had held additional meetings with the petitioner." Johnson II, 2014 WL 793636, at *10. In the petition for post-conviction relief that Johnson presented to the trial court, the only reference to prejudice stemming from trial counsel's failure to communicate with Johnson pretrial was that trial counsel did not learn earlier about the show-up identification that occurred. (Doc. No. 13-15, PageID# 960–61.) Had trial counsel known about the show-up, Johnson argued, he might have moved to suppress it. (Id.) But the TCCA rejected the suggestion that Johnson's failure to challenge the show-up identification reflected deficient performance, pointing out that "the show-up was part of an on-the-scene investigatory procedure immediately after the commission of the crime" and therefore "the identification was not subject to suppression." Johnson II, 2014 WL 793636, at *11. Even if it had been, trial counsel's decision not to challenge it would have been reasonable in light of his theory of the case—that Johnson had been "involved in a conflict with the store manager" but did not have the intent necessary to commit robbery. Id. at *5, 12. The TCCA's ruling on Johnson's failure to communicate claim was not based on an unreasonable application of Strickland.

Nor was it based on an unreasonable determination of the facts. Johnson argues that trial counsel's testimony at the evidentiary hearing did not support the TCCA's conclusion that trial counsel had met with Johnson "eight or nine times" prior to trial. Id. at *10; (Doc. No. 30, PageID# 1391). Johnson points out (Doc. No. 30, PageID# 1391) that trial counsel testified only that he had spoken with Johnson on "several occasions." (Doc. No. 13-16, PageID# 1144:3–8.) But a broader review of the transcript shows that the TCCA's conclusion was supported. In the post-conviction hearing, Johnson estimated that he had been in court eight or nine times before trial. (Id. at PageID# 1083:13–18.) When trial counsel was asked whether he agreed with that estimate, he stated that he did and claimed that it was his habit to discuss Johnson's case with him when he was in court. (Id. at PageID# 1145:4–18.) Although it is true that Johnson disputed that assertion, claiming that he never saw trial counsel prior to trial, the post-conviction court credited trial counsel's testimony. Johnson II, 2014 WL 793636, at *10. That determination of fact is entitled to a presumption of correctness under AEDPA, and Johnson has failed to rebut it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**b. Failure to engage in pretrial litigation**

As discussed above, Johnson has clarified that the factual predicate for this claim is trial counsel's failure to file five specific motions (Doc. No. 30, PageID# 1385–86): (1) a motion to dismiss one of the counts of aggravated robbery, (2) a motion to get a bill of particulars setting forth exactly what conduct was being relied upon for which counts, (3) a motion challenging the show-up identification on the day of the arrest, (4) a motion requesting that the court charge the long version of identification under the pattern jury instructions, and (5) a motion for funding for an expert on the inaccuracies of eye-witness identification. (Id.) The TCCA ruled on trial counsel's failure to file motions (1) and (3), Johnson II, 2014 WL 793636, at*11, but it was never fairly

presented with an opportunity to rule on trial counsel's failure to make the other motions and therefore an ineffective assistance claim based on that failure is procedurally defaulted.

With respect to trial counsel's failure to object to a "[m]ultiplicitous indictment" or challenge one of the counts of aggravated robbery (on the grounds that there had been only one "taking") (Doc. No. 1, PageID# 10), the TCCA found no deficient performance under the first prong of <u>Strickland</u> because "[t]he State may, of course, charge certain crimes under alternative theories and the petitioner offers no support for the proposition that, had the second aggravated robbery charge been challenged, the trial court would have been obliged to dismiss the count entirely." <u>Johnson II</u>, 2014 WL 793636, at *11. The implication of that reasoning is that the trial court could have simply reduced the second robbery charge to one of aggravated assault, which is what happened post-conviction anyway. The TCCA reasonably applied <u>Strickland</u> to find that Johnson had not shown that trial counsel's failure to file this motion amounted to deficient performance or caused him prejudice. <u>See id.</u>

The TCCA rejected the ineffective assistance claim concerning Johnson's failure to file a motion objecting to the show-up identification on grounds discussed above—trial counsel's decision not to challenge the show-up identification did not amount to deficient performance because the identification was legal and therefore not subject to suppression, and moreover, identity was not at issue in the prosecution given the defense's theory. <u>Johnson II</u>, 2014 WL 793636, at *11–12. The TCCA's application of <u>Strickland</u> here was reasonable.

### c. Failure to prepare an opening statement and failure to confront witnesses with inconsistencies

The TCCA dismissed these claims on the ground that Johnson had failed to demonstrate prejudice:

Regarding counsel's opening statement, the petitioner has presented no proof regarding how the outcome of the trial would have been different had counsel's preparation been more thorough. Although the petitioner called Detective Tarkington at the hearing to testify about inconsistencies between Mr. Alshinawa's initial statement to the police and his trial testimony,[12] the fundamentals of the witness's testimony—that the defendant entered the store, threatened Mr. Alshinawa and Ms. Moore with what appeared to be a gun in his pocket, and took money from the cash register—remained unchanged. Accordingly, he cannot show a reasonable probability that, but for any alleged errors, the result of the proceeding would have been different.

Id. at *10.

The TCCA's decision with respect to the claim that trial counsel failed to prepare an adequate opening statement was a reasonable application of Strickland. See Norman v. Bradshaw, No. 1:05CV1796, 2006 WL 3253121, at *15 (N.D. Ohio Nov. 8, 2006) (rejecting petitioner's conclusory claim that counsel's failure to provide an opening statement implied a concession of guilt that prejudiced him). Although trial counsel could have chosen to explicitly describe Johnson's theory of the case in the opening statement, as Johnson suggests (Doc. No. 30, PageID# 1380), the decision not to do so cannot be considered constitutionally deficient given that an attorney's choice not to make an opening statement at all "is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel." Millender v. Adams, 376 F.3d 520, 525 (6th Cir. 2004) (alteration in original) (quoting Millender v. Adams, 187 F. Supp. 2d 852, 870 (E.D. Mich. 2002)).

The TCCA also reasonably applied Strickland to reject Johnson's claim based on trial counsel's failure to confront Alshinawa with inconsistencies between his pretrial statements and

---

[12]    Detective Tarkington testified that he did not recall Alshinawa saying: (1) that Moore had walked to the back of the store to warn Alshinawa that they were being robbed; (2) that he or Moore had been forced to lie on the floor; (3) that Johnson had slammed Moore's head into the wall; or (4) that he had gotten into a shoving match with Johnson. (Doc. No. 13-16, PageID# 1120–21.)

his trial testimony (discussed above). Where the essential components of a witness's testimony are unaffected by inconsistencies between that testimony and a pretrial statement, a petitioner cannot establish a reasonable probability that the trial would have ended differently had the inconsistency been pointed out. See Poindexter, 454 F.3d at 572–73.

### d. Cumulative error

In response to petitioner's assertion that "[t]he cumulative effect of all the acts and omissions of trial counsel" listed in the petition amount to "the ineffective assistance of counsel to the degree that, absent the errors, there is a reasonable probability that the result of the trial would have been different" (Doc. No. 1, PageID# 12), Respondent states that "cumulative error is not a cognizable basis for federal habeas relief." (Doc. No. 14, PageID# 1323.) The Sixth Circuit has sent seemingly mixed messages on this issue. In Keith v. Mitchell, it rejected petitioner's argument that the cumulative effect of counsel's errors deprived him of a fair trial, stating that "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." 455 F.3d 662, 679 (6th Cir. 2006) (quoting Scott v. Elo, 302 F.3d 598, 607 (6th Cir. 2002)). But in United States v. Arny, the court held that, "[w]hen counsel's representation is deficient in several respects, as in this case, this court does not measure the result of each individual error, but 'consider[s] the errors of counsel in total, against the totality of the evidence in the case.'" 831 F.3d 725, 734 (quoting Stewart, 468 F.3d at 361).

Yet this tension is resolved if the rules from Keith and Arny are viewed as operating within different contexts. The cases cited in Keith to support the proposition that claims cannot be cumulated involved constitutional claims in addition to a claim of ineffective assistance of counsel, such as prosecutorial misconduct or erroneous jury instructions. See Keith, 455 F.3d at 679; Millender, 376 F.3d at 522; Scott, 302 F.3d at 601. The same is true of Keith itself, see 455 F.3d

at 665, and of <u>Moore v. Parker</u>, 425 F.3d 250, 252–53, 256 (6th Cir. 2005), the case Respondent cites to support its position (Doc. No. 14, PageID# 1323). Thus, when the court in <u>Scott</u> stated that the "Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief," it was referring to claims that are entirely different (like ineffective assistance of counsel and prosecutorial misconduct), not distinct theories of deficient performance within an ineffective assistance of counsel claim. <u>Scott</u>, 302 F.3d at 607. In <u>Arny</u>, the only constitutional violation that the petitioner alleged was ineffective assistance of counsel, and the court squarely held that "when counsel's representation is deficient in several respects," prejudice is measured cumulatively, or holistically. <u>Arny</u>, 831 F.3d at 728, 734.

The TCCA rejected Johnson's allegation of cumulative prejudice "because the doctrine is only applicable where the accused has established there was more than one error committed." <u>Johnson II</u>, 2014 WL 793636, at *13. Having found only one instance of deficient performance—trial counsel's failure to "alert [Johnson] to his potential sentencing exposure if he proceeded to trial" (discussed above)—the TCCA concluded that there was nothing to aggregate. <u>Id.</u> at *8, 13. That holding is consistent with <u>Arny</u>, which requires a cumulative analysis only "when counsel's representation is deficient *in several respects.*" <u>Arny</u>, 831 F.3d at 734 (emphasis added); <u>see also</u> <u>Millender</u>, 376 F.3d at 527 (rejecting petitioner's cumulative error argument in the context of an ineffective assistance of counsel claim because there was not "more than one error to consider cumulatively"). The TCCA's treatment of Johnson's cumulative error claim was not an unreasonable application of clearly established law. 28 U.S.C. § 2254(d)(1).

## IV. Conclusion

In light of the foregoing, Johnson's petition will be denied and this matter will be dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order denying a § 2254 petition. Rule 11, Rules Gov'g § 2254 Cases in the U.S. District Courts. Johnson may not take an appeal unless the Court issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made with a petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues presented were "adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (internal quotation omitted).

In this case, the issues raised in the petition do not merit further review. Thus, the Court will **DENY** a COA. 28 U.S.C. 2253(c)(1)(A). Johnson may, however, seek a COA directly from the United States Court of Appeals for the Sixth Circuit. Rule 11(a), Rules Gov'g § 2254 Cases in the U.S. District Courts.

An appropriate order is filed herewith.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE